**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Newport News Division


YVONNE WALLER,

                    Plaintiff,

v.                                     ACTION NO. 4:12cv131

CAROLYN W. COLVIN,[1]
Acting Commissioner
of Social Security,

                    Defendant.


## UNITED STATES MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff brought this action under 42 U.S.C. § 405(g), seeking judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") that denied Plaintiff's claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act.

This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia, by order of reference dated December 3, 2012. This Court recommends that the decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL BACKGROUND

Plaintiff, Yvonne Waller ("Ms. Waller"), filed an application for DIB on December 16,

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, and is substituted for Michael J. Astrue as the defendant in this suit. *See* Fed. R. Civ. Proc. 25(d).

2008, alleging she had been disabled since September 5, 2008. R. 118-27.[2] The Commissioner denied Ms. Waller's application, both initially on January 30, 2009 (R. 69), and upon reconsideration on June 18, 2009 (R. 98).

At Ms. Waller's request, a hearing before an Administrative Law Judge ("ALJ") took place on May 11, 2010. R. 39-68. On June 21, 2010, the ALJ issued a decision denying Ms. Waller's claim. R. 16-27. On June 12, 2012, the Appeals Council denied Ms. Waller's request to review the ALJ's decision, making the ALJ's decision the Commissioner's final decision. R. 1-5.

Having exhausted all administrative remedies, Ms. Waller filed a complaint with this Court on August 16, 2012. ECF No. 1. Defendant filed an Answer to the Complaint on November 29, 2012. ECF No. 4. Ms. Waller's Motion for Summary Judgment was submitted on February 6, 2013. ECF No. 12. Defendant's Motion for Summary Judgment was filed on March 5, 2013. ECF No. 14. As neither counsel in this case has indicated special circumstances requiring oral argument in this matter, the case is deemed submitted for a decision based on the memoranda.

## II. FACTUAL BACKGROUND[3]

Ms. Waller was born in 1966, and was 44 years old at her administrative hearing held May 11, 2010. R. 44. At the time of her application, Ms. Waller had completed two years of college, and she received a bachelor's degree in criminal justice in June 2009. R. 45, 163. She worked in the past as a corrections officer, a dispatcher, a medical clerk, and a security guard. R. 157, 166.

---

[2] Page citations are to the administrative record previously filed by the Commissioner.
[3] Defendant does not dispute Plaintiff's recitation of the medical evidence. Def.'s Mem. in Supp. of Mot. for Summ. J. 10. In addition, Plaintiff did not file a reply disputing those additional facts outline in Defendant's recitation of the facts. Consequently, the factual background in this Report and Recommendation is largely taken from the recitations made by the parties.

**A.  Past Relevant Work**

On January 29, 2009, Ms. Waller completed a Work History report describing the work she performed from March 1990 to September 2008. R. 166-73.  She wrote that in performing the job of dispatcher, she sat at a desk answering the telephones, dispatched the appropriate unit to respond to emergency situations, typed letters, faxed letters, and retrieved keys from department heads. R. 170. Ms. Waller explained that in the job, she walked half an hour per day, stood one and a half hours per day, and sat six hours per day. R. 170. Ms. Waller indicated that she kneeled, stooped, reached, wrote, typed, and handled small objects, but that she did not climb, crouch, crawl, handle, grab, or grasp big objects. R. 170. Ms. Waller reported that she lifted and carried patient medical records daily, ten to fifteen feet, but that she never lifted more than ten pounds. R. 170.

Ms. Waller described her part-time job of "security officer" or "security dispatcher." R. 166, 169.  She stated the position involved answering telephone calls, answering the radio, making entries on a log sheet, and reporting emergency calls to appropriate units. R. 166, 169. Ms. Waller reported that each day, this job required one-half hour of walking, one hour of standing, seven to eight hours of sitting. R. 169.  It required lifting and carrying less than ten pounds, reaching, writing, typing, and handling small objects, but involved no climbing, kneeling, crouching, crawling, handling, grabbing, or grasping of big objects. R. 169.

**B.  Medical Evidence**

Ms. Waller saw Shawke Soueidan, M.D., with Williamsburg Neurology, for the first time on August 17, 2006. R. 334. She explained to him that she had been in an automobile accident in March 2006, and had developed constant pain in the right lower back. R. 334.  The pain frequently radiated down her right leg, and sometimes behind her foot and ankle, with spasms

across the upper back bilaterally. R. 334. She had undergone x-rays, a lumbar MRI, and chiropractic treatments from Dr. Pinto. R. 334. She was also being treated with the medication Klonopin. 334. Examination revealed weakness of the right lower extremity, a positive right leg-raising test,[4] diminished right ankle reflexes, and an antalgic gait. R. 334-335. Dr. Soueidan diagnosed her with possible L5/S1 radiculopathy, increased her Klonopin dosage, and planned to obtain an EMG of the right lower extremity. R. 335.

Dr. Soueidan treated Ms. Waller on January 11, 2007; October 26, 2007; November 30, 2007; December 3, 2007; January 31, 2008; February 1, 2008 and March 26, 2008. R. 316-335. On January 31, 2008, Dr. Soueidan noted that Ms. Waller was experiencing headaches, aches, and pain in the lower extremity; a numbing and tingling sensation; swelling in the right knee; and, multiple tender points over the paraspinal muscles of the hips, shoulders, neck and thoracic region. R. 320. Dr. Soueidan noted that Ms. Waller had a fibromyalgia pattern of discomfort. R. 320.

On March 10, 2008, orthopedist Philip LeNoach, M.D., noted that Ms. Waller appeared comfortable sitting, had well-healed right foot scars, and made no complaints of low back pain. R. 238.

A March 26, 2008 MRI of Ms. Waller's brain was normal. R. 315.

On August 22, 2008, Dr. LeNoach reported that Ms. Waller described recurrent lower back pain during standing and work activity, with less effect from Flexeril, and with radiation of pain to the right leg. R. 234. She reported that she had fibromyalgia, had stopped using Lyrica due to side effects, and that Neurontin had not had any significant affect. R. 234. On examination she described tenderness in the paravertebral of the lumbar spine with painful motion. R. 234.

---

[4] The straight leg-raising test is designed to detect nerve root pressure, tension, or irritation. Richard H. Rothman M.D., Ph.D., and Frederick A. Simeone, M.D., *The Spine*, 696-98 (3rd ed. 1992).

She had normal straight leg-raising and motor sensory reflexes of the L4/S1 level of the spine. R. 234. X-rays did not demonstrate any significant findings. R. 234. Dr. LeNoach's impression was that Ms. Waller had chronic mechanical low back pain. R. 234. He recommended chiropractic treatment and physical therapy. R. 234. Dr. LeNoach opined that he "did feel she could resume her work at this time." R. 234.

Ms. Waller made an initial visit to Leroy Graham, Jr., M.D., a family practice physician, on September 4, 2008, for persistent pain due to spasms in the neck and back, which had started after a motor vehicle accident in March 2006. R. 269. She reported that Flexeril, a TENS Unit and Lyrica treatments were unsuccessful. R. 269. She reported that the chiropractor did help. R. 269. The examination revealed muscle spasms and paraspinal lumbar tenderness. R. 270. Dr. Graham recommended chiropratic treatment, medications and resuming use of the TENS unit. R. 270.

On October 20, 2008, Dr. Graham found that Ms. Waller had positive straight leg-raising tests, paraspinal tenderness, and a decrease in motor function and range of motion due to pain, but had normal curvature of the spine, normal sensation, and normal reflexes. R. 268.  Dr. Graham noted that Ms. Waller had been relieved of her job duties due to chronic limitations. R. 267. Ms. Waller reported pain in the neck radiating down both legs. R. 263. She had been prescribed Vicodin for the pain and Flexeril for the spasms. R. 262, 264, 268. Dr. Graham noted that she continued to have back pains with spasms. R. 263.

On October 24, 2008, Ms. Waller was again examined by her neurologist Dr. Soueidan, for follow-up of fibromyalgia pain, neuropathic pain, and lumbar radiculopathy. R. 313. Ms. Waller reported lumbar spine pain with radiation to legs, intermittent weakness, and fatigue. R. 313. Dr. Soueidan noted that her gait was narrow-based and antalgic. R. 313.  Dr. Soueidan

noted no changes in the fibromyalgia and pain, which was being controlled with Flexeril and Clonazepam. R. 313.

On November 5, 2008, Dr. Soueidan examined Ms. Waller. R. 313. Ms. Waller had a narrow-based antalgic gait, but was able to rise from a chair without difficulty and was able to stand and walk on her toes and heels with pain. R. 313. Ms. Waller had 4+/5 strength in her extremities, intact facial sensation, intact vibratory sense in her toes, and she was able to perform rapid alternating movements. R. 314. Dr. Soueidan noted that Ms. Waller's symptoms of pain were controlled with her current medications. R. 314.

On November 24, 2008, Ms. Waller reported to Nurse Practitioner Vince Mertz at Hampton Roads Neurological & Spine Specialists that physical therapy and ultimately chiropractic treatment made her pain worse, and that Vicodin and Flexeril were of no significant benefit. R. 276. She described the pain as severe in her neck and shoulders, radiating down her spine into her buttocks and behind the knees. R. 276. Nurse Practitioner Mertz noted that Ms. Waller was morbidly obese, in mild to moderate distress, and was weeping throughout the examination and interview. R. 277. Ms. Waller had diminished motor reflexes, but normal tone, bulk, power, coordination, and range of motion in all four extremities. R. 277. She had trapezius tenderness to palpation, but a negative straight leg-raising test. R. 277. Her lumbar and cervical spine x-rays were normal. R. 277-78. Nurse Practitioner Mertz reported an impression of myofascial neck and back pain and some psychosomatic overlay, noting that Ms. Waller "seems to have significantly more pain than her clinical presentation would suggest." R. 277. He also noted neck pain, low back pain, and probable questionable depression, as Ms. Waller "ha[d] recently been laid off from her job." R. 277. He noted that Ms. Waller was not a surgical candidate from a neurosurgical standpoint as there was no pathology present in her x-rays nor in

her clinical examination. R. 277.

On December 3, 2008, Dr. Graham noted that Ms. Waller again had back tenderness, positive straight leg-raising, and decreased motor function and range of motion due to pain, but normal sensory examination and normal reflexes. R. 263.

On January 29, 2009, state agency physician Carolina Bacani-Longa, M.D., determined that Ms. Waller could perform medium work with frequent climbing of ramps; occasional climbing of ladders, ropes, and scaffolds; occasional kneeling, crouching, and crawling; no concentrated exposure to temperature extremes, wetness, or humidity; and no exposure to fumes, odors, dusts, gases, or poor ventilation. R. 79-82. Dr. Bacani-Longa opined that Ms. Waller could return to her past relevant work as a dispatcher. R. 83.

On February 25, 2009, Dr. Graham noted that Ms. Waller had back tenderness, positive straight leg-raising, decreased motor function and range of motion due to pain, but normal sensory examination and normal reflexes. R. 262.

On April 6, 2009, Ms. Waller saw Raouf Gharbo, D.O., who noted that Ms. Waller had two normal electrodiagnostic studies, as well as normal cervical and lumbar x-rays. R. 273. Dr. Gharbo noted that Ms. Waller had an antalgic gait, more than 12 tender points, rachety muscle weakness in all four limbs, and pain with range of motion in the cervical and lumbar spine. R. 274. Dr. Gharbo diagnosed Ms. Waller with fibromyalgia, chronic low back pain, and neck pain. R. 274. He concluded that Ms. Waller's "disability appear[ed] out of proportion to her impairment." R. 274. He reported that there were "significant somatization issues regarding [a past] motor vehicle collision" and that Ms. Waller "[was] very angry at the driver and at her current state." R. 274. Dr. Gharbo gave Ms. Waller resources regarding fibromyalgia, and discussed the three main principles of exercise, quality sleep, and stress management. R. 274. He

prescribed Cymbalta for the fibromyalgia and depression. R. 274. He also recommended aquatic aerobics and Flexeril at night instead of during the day. R. 274.

On April 10, 2009, Dr. Graham noted that Ms. Waller had paraspinal lumbar tenderness, but an unremarkable neurologic examination. R. 260. Dr. Graham noted Ms. Waller continues to have muscle spasms taking Vidocin and Flexeril, but that current treatment was to continue. R. 259-60.

On May 21, 2009 and June 8, 2009, Charlene Lee, M.D., a primary care physician at Patriot Primary Care, reported that Ms. Waller had generally normal physical examination findings. R. 291, 295. Dr. Lee diagnosed her with neuropathy, idiopathic peripheral NOS. R. 291. On August 18, 2009, Dr. Lee noted that Ms. Waller had a negative straight leg-raising test. R. 290.

A June 16, 2009 cervical spine MRI showed mild straightening of the cervical spine with mild spondylitic change, no disc herniations, and no significant stenosis. R. 286. A lumbar spine MRI showed no disc herniation or evident canal or foraminal narrowing. R. 284.

On June 18, 2009, state agency physician Leopold Moreno, M.D., opined that Ms. Waller could perform light work with occasional climbing of ramps and stairs; no climbing of ladders, ropes, and scaffolds; occasional stooping, kneeling, crouching, and crawling; the avoidance of concentrated exposure to temperature extremes, wetness, and humidity; and the avoidance of all exposure to fumes, odors, dusts, gases, and poor ventilation. R. 93-94.

On June 29, 2009, Dr. Lee noted that Ms. Waller had decreased sensation in the left cheek, but that her other cranial nerves were normal. R. 283. Ms. Waller also had a normal gait and station. R. 283.

On July 23, 2009, Dr. Soueidan noted that Ms. Waller reported increasing symptoms. R.

301. Dr. Soueidan indicated that "[a]ll of the symptoms are somewhat vague, without any specific functional limitation other than fatigability and the chronic pain, which in her opinion makes her disabled." R. 301. The examination revealed tenderness over the paraspinal muscles and lower spinal muscles, positive Romberg, and antalgic gait. R. 301. He prescribed Clonazepam for vertigo and cervicogenic pain, which helped, but did not alleviate all the pain. R. 301. Dr. Soueidan diagnosed her with fibromalgia, neuropathic discomfort, and vague CNS symptoms with no clear pathology. R. 301.

On August 18, 2009, Ms. Waller reported to Dr. Lee that after she had taken a 4.5 hour car ride in June, her knees flared, and she had used Icy Hot and applied an ace bandage to her knees to help the swelling. R. 338. Ms. Waller reported to Dr. Lee that she had numbness and tingling in her right forearm. R. 338. Dr. Lee noted that Ms. Waller had a normal gait and station, full range of motion in her lower extremities without joint effusions or warmth, some laxity with valgus stress in the knees, no pain with hip motion except some slight discomfort with inward medial right hip rotation, some tightness in her right forearm, and no edema or fullness. R. 339. Dr. Lee wrote that no abnormalities were noted on that day's examination. R. 339. Dr. Lee advised Ms. Waller to continue the ace wrap brace to the knees and to stretch the right arm, and he gave her samples of Celebrex. R. 339.

On September 10, 2009, Dr. Soueidan noted that Ms. Waller had recently been laid off from her job and just learned that she had a grandchild. R. 340. Ms. Waller had tried Vicodin, Flexeril, Lyrica and Amitriptyline without successful treatment, and she had side effects to Lyrica and Amitriptyline. R. 340. He noted that it was not clear if the Cymbalta was helping her pain. R. 340. On physical examination, Ms. Waller had a narrow-based gait and normal extremity strength. R. 341. Ms. Waller had difficulty rising from her chair due to lower back

pain and had some mild unsteadiness with tandem gait, but she was able to walk on her toes and heels. R. 341. Dr. Soueidan advised Ms. Waller to add daily exercise to help with stress and pain, and asked her to cut down to one beer per day (from two) in an attempt to help with foot numbness. R. 340-41.

Ms. Waller was examined by Dr. Lee on September 14, 2009, for knee pain. R. 336. Ms. Waller reported that she had recurrent pain and swelling of both knees with pain worsening by standing for long periods and by sitting for extended periods. R. 336. She reported that her knees have also given out on her. R. 336. She worked for a few days, which caused her knees to swell. R. 336. She also reported to Dr. Lee that she continued to have pain in her muscles and muscle spasms, numbness from the right side of her neck to her arm, left side numbness, and tingling. R. 336. Dr. Lee referred her for a knee x-ray, and advised her to continue exercising for 20 minutes, three times a day. R. 337.

On September 30, 2009, Dr. Lee reported that Ms. Waller had a normal gait and station, and had full range of motion in her lower extremities without joint effusion or warmth. R. 337. Dr. Lee encouraged Ms. Waller to continue exercising for 20 minutes, three times a day, and to perform low-impact exercise to decrease knee stress. R. 337.

On November 12, 2009, Dr. Soueidan noted that Ms. Waller was still without work, though she was seeking a job, and that her son recently lost his job and wanted to move back home. R. 358. On physical examination, Ms. Waller had a narrow-based gait and was unsteady with a tandem gait, but she was able to rise from a chair with only mild difficulty, walked well on her toes and heels without loss of balance, had strong grips bilaterally, and had normal and symmetric extremity strength. R. 359. Dr. Soueidan noted that Ms. Waller's pain was stable on her present medications. R. 359.

Nurse Practitioner Harbin also examined Ms. Waller on November 12, 2009, writing that Ms. Waller received a course of Prednisone, which helped her pain, and caused her elevated CRP and ESR to return to normal. R. 358. Ms. Waller reported that she was experiencing diffuse pain, muscles spasms, numbness, and tingling to her hands and feet even though she was taking Cymbalta, Clonazepam and Flexeril. R. 358. She reported pain in her lower back, between her shoulders, and in her left knee; and, decreased strength intermittently, with difficulty removing lids from jars, dropping items and having to switch to paper and plastic dishes. R. 358. A knee x-ray and left arm EMG were normal. R. 358. Ms. Waller remained depressed and Nurse Practitioner Harbin discussed counseling through the church or Project Care. R. 358. Nurse Practitioner Harbin wrote that Ms. Waller's pain was stable on present medications. R. 359. She further wrote that the depression was likely contributing to Ms. Waller's pain and advised her that her depression needed to be managed effectively to help with pain control. R. 359. Nurse Practitioner Harbin diagnosed Ms. Waller with fibromyalgia pattern of pain and depression. R. 359.

On November 18, 2009, Ms. Waller's attorney asked Dr. Soueidan to provide an opinion on her capacity to work in connection with her claim for Social Security benefits. R. 348. On December 29, 2009, Dr. Soueidan completed a "Medical Source Statement of Ability to Do Work-Related Activities" indicating that Ms. Waller could continuously lift and carry up to ten pounds, and could occasionally lift and carry up to 20 pounds. R. 349. Dr. Soueidan further opined that Ms. Waller could sit or stand for an hour without interruption, walk 20 minutes without interruption, sit eight hours (if not continuously) in an eight-hour work day, stand for an hour in an eight-hour work day, and walk for an hour in an eight-hour work day. R. 350. Dr. Soueidan clarified that Ms. Waller was able to perform for up to a total of ten hours. R. 350. Dr.

Soueidan also opined that Ms. Waller could occasionally use her hands and feet, could occasionally engage in postural activities (except the climbing of ladders and scaffolds), and was not impaired with respect to hearing and vision. R. 352. Dr. Soueidan still further opined that Ms. Waller could not work around unprotected heights, dust and other pulmonary irritants, and extreme temperatures, but could occasionally work around moving mechanical parts, operate a motor vehicle, work around humidity or wetness, and work around vibrations. R. 353.

In addition to checking boxes on the form to indicate the limitations listed above, Dr. Souiedan noted Ms. Waller had intermittent decreased strength to her hands; had difficulty opening lids; dropped items frequently; was unable to drive for long periods or sit due to leg numbness; fell due to pain and swelling; needed assistance with shopping or walking any distance; and, was unable to perform duties as a security officer due to frequent muscle spasms and pain with standing, sitting and walking. R. 348-54.

On April 20, 2010, Ms. Waller was examined by Nurse Practitioner Harbin and Dr. Souiedan. R. 355-56. Nurse Practitioner Harbin assessed a fibromyalgia pattern of pain with 9 out of 11 trigger points to upper and lower half of Ms. Waller's body bilaterally. R. 355. Ms. Waller's reported her pain was averaging 6-7 out of 10 R. 355. Ms. Waller reported paresthesias, numbness, depression and insomnia. R. 356. She was directed to continue the Cymbalta for the depression, increase exercise to her tolerance, and not to self-increase her dosage of Clonazepam. R. 356. Dr. Souridan reported that Ms. Waller exercised 45 minutes daily, five times a week. R. 355. On physical examination, Ms. Waller was able to rise from her chair without difficulty, had a narrow-based gait, and walked well on her toes and heels. R. 356. Ms. Waller also had normal and symmetric extremity strength. R. 356.

### C. Administrative Hearing Testimony – May 11, 2010

Ms. Waller testified that she was 44 years of age with a bachelor's degree in criminal justice, which she obtained in June 2009. R. 44, 45. She had a driver's license and drove about 10 times a month to doctors' appointments and to pick up medications when her children were not available to drive her. R. 45. She added that she only drove within twenty miles of her home. R. 45. She explained that she used her left hand and left leg to drive, because her right side goes numb and tingly from the neck down to her lower back and right leg. R. 46. Ms. Waller testified that she is right-handed and had problems writing due to difficulty holding her pen, and keeping it in place, when her hands went numb and tingly. R. 44, 45.

Ms. Waller stated she had problems with stairs due to pain. R. 47. At times, she had to crawl up the steps and scoot down the steps. R. 47. She added that she had fallen down the steps from her knees giving out. R. 47, 48. She testified that her son moved back into the home to assist her. R. 49. She could not wash dishes or clean. R. 62. She testified that she walks about 45 minutes for exercise, and that her son goes with her. R. 66.

From October 2005 to March 2008, Ms. Waller worked at Patriot's Colony, a retirement nursing home, as a security officer. R. 50, 51.  She monitored the property, documented entries of visitors, and made security rounds. R. 50, 51. She explained that she was in a automobile accident in March 2006. R. 51.  When she returned to work between April and July 2006, she needed assistance with walking and driving. R. 51. She stated that her co-worker would make the security rounds because she was unable. R. 51.

She next worked from March 2008 to September 2008, at Green Springs Vacation Resorts, as a security officer. R. 49, 52.  She did not let them know that she had been involved in an automobile accident, because she needed the job. R. 49, 52. She explained her duties involved

driving for 8 to 12 hours around the property, responding to emergencies, and writing entries of guest visits (150 to 200 visits per day). R. 49, 50. After sitting in the vehicle, it was difficult for her to get out, because her body was stiff and she moved slower. R. 49. She stated that she also had problems with walking, driving, standing for long periods of time, responding to emergencies, walking up and down steps, making security rounds, and writing. R. 52. She added that she was eventually terminated when she called in sick, because she could not get out of bed from muscle spasms. R. 52. She stated that she returned to work with a doctor's note, and the supervisor told her that she did not meet the requirements to be in security. R. 52. The supervisor told her that he didn't want her to reinjure herself working on their property. R. 52, 53. Therefore, he relieved her of her duties. R. 52, 53.

Ms. Waller testified that she experienced pain from her neck through her lower back down to her right foot, as well as numbness and tingling. R. 53. She described her pain as constant, usually waking with a level 7 and worsening to a level 10. R. 54. She explained that lying down decreased the pain from a 10 to a 7 until the muscle spasms started. R. 54. She stated that she would lie down for 8 to 10 hours during the day. R. 54. She testified that her neck and the lower part of her back got stiff, and her back locked up. R. 55. She added that both knees swell, with the left being worse than the right. R. 55. She also testified that she experienced weakness in her knees and hands. R. 55. She stated that she experienced the pain, numbness, stiffness, swelling and weakness every day. R. 55, 56.

Ms. Waller testified that she had trouble buttoning her shirt and pants. R. 56. Her son monitored her when she took a shower, and helped her with her clothing when she had muscle spasms and was unable to lift her arms. R. 56. She explained that the muscle spasms occur every day from underneath her neck down her shoulders, underneath her shoulder blades, and down her

spine to her lower back. R. 56.

Ms. Waller testified that she had been treated with different pain medications, muscle relaxants and physical therapy. R. 56, 57. She explained that the medication made her body feel numb, but the pain and muscle spasms were still there, and the physical therapy made it worse. R. 57. She stated that she had seen a chiropractor, and that when he started cracking her neck and back, the pain was worse. R. 58. She added that she saw Dr. Gharbo for pain management, but had to discontinue treatment with him because she did not have insurance. R. 58. Instead, she had received treatment from Dr. Soueidan under the Project Care Program. R. 59.

Ms. Waller testified that she tried drinking two beers a day to relax her body. R. 59. She stated that she also tried increasing the dosage of her muscle relaxants due to pain and her inability to sleep. R. 59. She stated that she was getting probably three hours of sleep a night. R. 60. She stated that the beer and the increase in the medication dosages did not work. R. 60.

Ms. Waller testified that her doctor told her that she was going through depression. R. 61. She added that it was hard for her to accept the doctor telling her that she could not go back into the criminal justice field, because she had finished college and was planning for a career in that field. R. 61. She explained that the depression has caused her to have feelings of hopelessness and to withdraw from people by staying upstairs in her room. R. 61, 62. Ms. Waller testified that Dr. Soueidan advised her that he was going to monitor her, and keep working with her as needed for pain. R. 62.

Ms. Waller's two sons were present at the hearing in order to testify. R. 67. The ALJ accepted by stipulation that Ms. Waller's sons' testimony would corroborate her testimony. R. 67.

# III. STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g) (2011); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as 'a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than preponderance. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the [Commissioner's] designate, the ALJ)." *Craig*, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Perales*, 402 U.S. at 390; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).

Thus, reversing the denial of benefits is appropriate only if either (A) the ALJ's determination is not supported by substantial evidence on the record, or (B) the ALJ made an error of law. *Coffman,* 829 F.2d at 517.

# IV. <u>ANALYSIS</u>

To qualify for a period of disability and DIB under section 216(i) and 223 of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application for DIB and a period of disability, and be under a "disability" as defined in the Act. The Social Security Regulations define "disability" for the purpose of obtaining disability benefits under Title II of the Act as the inability to do any substantial gainful activity, by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 20 C.F.R. § 404.1505(a) (2012); *see also* 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A) (2012). To meet this definition, the claimant must have a "severe impairment," which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy.

In evaluating disability claims, the regulations promulgated by the Social Security Administration provide that all material facts will be considered to determine whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The ALJ must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals a condition contained within the Social Security Administration's official listing of impairments, (4) has an impairment that prevents her from past relevant work, and (5) has an impairment that prevents her from any substantial gainful employment. An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability. This analysis is set forth in 20 C.F.R. § 404.1520.

"When proceeding through this five step analysis, the ALJ must consider the objective medical facts, the diagnoses or medical opinions based on these facts, the subjective evidence of pain and disability, and the claimant's educational background, age, and work experience." *Schnetzler v. Astrue*, 533 F. Supp. 2d 272, 286 (E.D.N.Y. 2008). At all steps the ALJ bears the ultimate responsibility for weighing the evidence. *Hays*, 907 F.2d at 1456.

**A. ALJ's Decision**

In this case, the ALJ found the following regarding Ms. Waller's condition. First, Ms. Waller met the insured status requirements of the Act through December 31, 2013. R. 21. Second, Ms. Waller did not engage in substantial gainful activity from her alleged onset of disability on September 5, 2008, through the date of the administrative hearing. R. 21. Third, Ms. Waller's degenerative disc disease and asthma constituted severe impairments. R. 21. The ALJ also found that all other impairments alleged, and found in the record, were nonsevere. R. 22. Fourth, Ms. Waller did not have an impairment or combination of impairments that meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 22. Fifth, Ms. Waller had the residual functional capacity to perform a limited range of light work. R. 23. Sixth, Ms. Waller was capable of performing past relevant work as a dispatcher. R. 27. These findings led the ALJ to conclude Ms. Waller was not under a disability at any time between the alleged onset date of September 5, 2008, through the date of his decision, June 21, 2010. R. 27.

In her Memorandum in Support of her Motion for Summary Judgment, Ms. Waller alleges the ALJ made three errors in this case. First, Ms. Waller contends the ALJ erred by failing to accord adequate weight to the opinion of Ms. Waller's treating neurologist, Dr. Soueidan, regarding Ms. Waller's condition of fibromyalgia. Mem. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mem.") 18. Second, Ms. Waller claims that the ALJ erred by finding Ms.

Waller can perform her past relevant work as a dispatcher. *Id.* at 23. Third, Ms. Waller contends the ALJ erred in failing to make proper credibility findings as to Ms. Waller's testimony. *Id.* at 24.

### B. The ALJ Did Not Err in Assigning Moderate Weight to Dr. Soueidan's Opinion

Ms. Waller points out that, at the time of his opinion, Dr. Soueidan had been treating Ms. Waller for fibromyalgia for over five years. Pl.'s Mem. 19. She contends his opinion is consistent with the other evidence of record, including Ms. Waller's testimony at her administrative hearing, and the treatment notes of Dr. LeNoach, Dr. Graham, Dr. Gharbo, Dr. Lee, and Nurse Practicioner Mertz. Pl.'s Mem. 20. Accordingly, Ms. Waller asserts Dr. Soueidan's opinion is entitled to greater weight. Pl.'s Mem. 20. Respondent counters that many aspects of Dr. Soueidan's opinion were adopted in the ALJ's RFC finding, while other aspects were not consistent with substantial evidence in the record. Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") 13-15. Consequently, Defendant argues the ALJ did not err in assigning Dr. Soueidan's opinion moderate weight. *Id.*

A treating source's opinion on issues regarding the nature and severity of an impairment is to be given controlling weight if it is well supported by medically-accepted clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1526(b), 404.1527(d), 416.927(d)(2). However, it follows that "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

Dr. Soueidan's opinion, as stated in a Medical Source Statement dated December 29, 2009, was that Ms. Waller could continuously lift and carry up to ten pounds; occasionally lift and carry up to 20 pounds; sit or stand for an hour without interruption; walk 20 minutes without

interruption; sit eight hours (if not continuously) in an eight-hour work day; stand for an hour in an eight-hour work day; walk for an hour in an eight-hour work day; and, perform for up to a total of ten hours. R. 349-50. Dr. Soueidan also opined that Ms. Waller could occasionally use her hands and feet; could occasionally engage in postural activities (except the climbing of ladders and scaffolds); was not impaired with respect to hearing and vision; could not work around unprotected heights, dust and other pulmonary irritants, and extreme temperatures; but, could occasionally work around moving mechanical parts, operate a motor vehicle, work around humidity or wetness, and work around vibrations. R. 352-53. In addition, Dr. Souiedan noted Ms. Waller had intermittent decreased strength to her hands; had difficulty opening lids; dropped items frequently; was unable to drive for long periods or sit due to leg numbness; fell due to pain and swelling; needed assistance with shopping or walking any distance; and, was unable to perform duties as a security officer due to frequent muscle spasms and pain with standing, sitting and walking. R. 348-54.

The ALJ assigned Dr. Souiedan's opinion moderate weight, because it was only somewhat consistent with the evidence of record as a whole. R. 26. The ALJ ultimately determined Ms. Waller had the residual functional capacity to perform light work except that she could lift or carry no more than 20 pounds occasionally and 10 pounds frequently; could sit for 6 hours, and stand or walk for 6 hours in an 8-hour day; could perform no more than occasional stooping; must avoid concentrated exposure to extreme cold, extreme heat, wetness, and humidity; and, must avoid all exposure to fumes, odors, dusts, and gases. R. 23.

The ALJ's RFC finding adopted the majority of the limitations indicated in Dr. Soueidan's form responses. There are two notable exceptions: (1) the ALJ found that Ms. Waller was able to walk or stand for 6 hours in an 8-hour day, when Dr. Soueidan's opinion was

that she could walk for 1 hour and stand for 1 hour in an 8-hour day; and (2) Dr. Soueidan opined Ms. Waller could only occasionally reach, finger, handle, push/pull, and operate foot controls whereas the ALJ found her capable of light work, which requires "some pushing and pulling of arm or leg controls." *See* 20 C.F.R. §§ 404.1567(b), 416.967 (b). In his written notations, Dr. Soueidan explained many of Ms. Waller's symptoms. Ms. Waller asserts these symptoms represent ongoing limitations to Ms. Waller's ability to work, precluding her from any substantial gainful activity. Pl.'s Mem. 22. The Court is not persuaded that this is an accurate characterization of Dr. Soueidan's opinion.

Nevertheless, a review of the record reveals substantial evidence to support the ALJ's decision to assign Dr. Soueidan's opinion moderate weight, and find Ms. Waller capable of returning to her past relevant work as a dispatcher. Both Dr. Soueidan's treatment notes, and the treatment notes of Ms. Waller's other treating physicians provide substantial evidence in support of the ALJ's decision.

On November 5, 2008, Dr. Soueidan noted that Ms. Waller's symptoms of pain were controlled with her current medications. R. 314. On July 23, 2009, Dr. Soueidan noted that "[a]ll of the symptoms are somewhat vague, without any specific functional limitation other than fatigability and the chronic pain, which in her opinion makes her disabled." R. 301. During Ms. Waller's September 10, 2009 examination, Dr. Soueidan advised Ms. Waller to exercise daily. R. 337. On November 12, 2009, Dr. Soueidan noted that Ms. Waller's pain was stable on her present medications. R. 359. On April 20, 2010, Dr. Souridan reported that Ms. Waller exercised 45 minutes daily, five times a week. R. 355. On physical examination, Ms. Waller was able to rise from her chair without difficulty, had a narrow-based gait, and walked well on her toes and heels. R. 356. Ms. Waller also had normal and symmetric extremity strength. R. 356.

The treatment notes from Ms. Waller's other treating sources similarly provide substantial support for the ALJ's findings. On August 22, 2008, Dr. LeNoach reported that Ms. Waller's x-rays did not demonstrate any significant findings, but that she had chronic mechanical low back pain. R. 234. Dr. LeNoach recommended chiropractic treatment and physical therapy, and opined that he "did feel she could resume her work at this time." R. 234.

On November 24, 2008, Nurse Practitioner Mertz's examination revealed normal tone, bulk, power, coordination and range of motion in all four extremities, negative straight leg-raising test, and normal lumbar and cervical spine x-rays. R. 277-78. Nurse Practitioner Mertz found that Ms. Waller "seems to have significantly more pain than her clinical presentation would suggest." R. 277.

On April 6, 2009, Dr. Gharbo noted that Ms. Waller had two normal electrodiagnostic studies, as well as normal cervical and lumbar x-rays. R. 273. Dr. Lee reported normal physical examination findings in May and June 2009. R. 291, 295. In September 2009, Dr. Lee encouraged Ms. Waller to exercise for twenty minutes three times a day. R. 337. Similarly, in August 2010, Nurse Practitioner Harbin encouraged Ms. Waller to exercise. R. 356.

In light of these treatment records from Ms. Waller's treating sources, including Dr. Soueidan's records, substantial evidence in the record supports the ALJ's decision that Dr. Soueidan's opinion contained in his Medical Source Statement was entitled to moderate weight.

## C. The ALJ Did Not Commit Error in Finding Ms. Waller Could Perform Her Past Relevant Work as a Dispatcher

Next, Ms. Waller argues that because the ALJ failed to discuss the pertinent duties of Ms. Waller's past relevant work, there is not sufficient evidence to support the ALJ's finding that Ms. Waller was capable of performing her past relevant work as a dispatcher. Pl.'s Mem. 23-24.

At step four of the sequential analysis, the claimant must show an inability to return to

her past relevant work. *Thompson v. Astrue*, 442 F. App'x 804, 806 (4th Cir. 2011) (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987)). A claimant is not disabled if she can return to her past relevant work as she actually performed it, or can perform the work as it is generally performed in the national economy. *Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8P (S.S.A July 2, 1996). Consequently, the agency requests information from the claimant about her past relevant work. 20 C.F.R. § 404.1560(b)(2), 404.1565(b). Further, the ALJ can rely on resources such as the Dictionary of Occupational Titles ("DOT") to determine a claimant's ability to perform past relevant work as it is performed in the national economy. *Thompson*, 442 F. App'x at 807 (citing 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2)).

Ms. Waller's description of the work she performed as a dispatcher, and as a security dispatcher, would classify both as sedentary positions. R. 170. As a dispatcher, she walked one-half hour per day, stood one and one-half hours per day, and sat six hours per day. R. 170. Ms. Waller indicated that she kneeled, stooped, reached, wrote, typed, handled small objects, and lifted and carried less than ten pounds. R. 170. Ms. Waller indicated the job of "security officer" or "security dispatcher" required that in an 8-hour day, she walk for one-half hour, stand for one hour, and sit for seven to eight hours, as well as lift and carry less than ten pounds, reach, write, type, and handle small objects. R. 169.

In finding Ms. Waller was capable of performing past relevant work as a dispatcher, the ALJ found she was capable of performing the job as "actually and generally performed." R. 27. In doing so, the ALJ relied upon the DOT, Code 379.362-010 (classifying work as a dispatcher as a sedentary position), Ms. Waller's work history report summarized above, and her hearing testimony. R. 27.

Ms. Waller relies on one case in support of her argument that the ALJ's decision is not

supported by substantial evidence, *Parsons v. Apfel*, 101 F. Supp. 2d 357, 362 (D. Md. 2000). Pl.'s Mem. 23. In *Parsons*, the claimant testified that after his heart attack, he could no longer perform the travel and frequent lifting of heavy garment bags required in his past work as a salesman. *Parsons*, 101 F. Supp. 2d at 362. He testified that he relied on his wife and son-in-law to do this part of the job, while he performed the work of a "consultant" in filling out the paperwork. *Id.* The ALJ found Mr. Parsons could perform his previous work as a consultant, as well as his past relevant work as a "salesman" and "consultant" as these jobs are performed in the national economy as outlined in the DOT. *Id.* Because the ALJ did not discuss Mr. Parson's past relevant work, and made only a "vague reference" to the DOT, the court was denied a basis for meaningful review of the ALJ's decision. *Id.* at 363. The court found there was not substantial evidence to support the decision, and remanded for the ALJ to identify and describe the job duties for the positions he labeled "salesman" and "consultant," as well as to provide the specific DOT job titles and reference numbers on which he relied. *Id.* The *Parsons* case is not controlling, and is easily distinguished.

In this case, the ALJ found Ms. Waller capable of performing her past relevant work exactly how she described performing it. Further, the ALJ cited the portion of the DOT relied upon in making his decision. The ALJ's decision sufficiently explains his finding, and there is substantial evidence in the record to support the ALJ's decision that Ms. Waller could perform her past relevant work as a dispatcher.

### D. The ALJ Did Not Err in Finding that Ms. Waller Was Not Fully Credible

Lastly, Ms. Waller asserts the ALJ failed to perform a complete analysis of the evidence in regard to the diagnosis of fibromyalgia when discounting Ms. Waller's credibility. Pl.'s Mem. 24-26. The residual function capacity (RFC) determination must incorporate not only

impairments supported by objective medical evidence, but also those impairments based on credible complaints made by the claimant. The ALJ uses a two-step analysis in evaluating a claimant's subjective complaints. *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). First, the ALJ must determine whether there is an underlying medically determinable impairment that could reasonably produce the claimant's pain or symptoms. *Id.* If the underlying impairment could reasonably be expected to produce the claimant's pain, the ALJ must then evaluate the claimant's statements about the intensity and persistence of the pain, as well as the extent to which it affects the individual's ability to work. *Id.* at 595.

The ALJ's evaluation must take into account all available evidence, including a credibility finding of the claimant's statements regarding the extent of the symptoms, and the ALJ must provide specific reasons for the weight given to the claimant's subjective statements. *Id.* at 595-96. Social Security Ruling 96-7p states that the evaluation of a plaintiff's subjective complaints must be based on the consideration of all the evidence in the record, including, but not limited to: (1) medical and laboratory findings, (2) diagnoses and medical opinions provided by treating or examining physicians and other medical sources; (3) statements from both the individual and treating or examining physicians about the claimant's medical history, treatment, response, prior work record, and the alleged symptoms' effect on the ability to work.

The ALJ found Ms. Waller's allegations of disabling pain were inconsistent with objective findings and subjective findings on examinations, and were not fully credible. R. 26. He further stated he did not doubt Ms. Waller's diagnoses, including fibromyalgia, but found they did not preclude Ms. Waller from engaging in work activity or employment. R. 25, 26. Ms. Waller admits that repeated objective tests, such as x-rays, MRIs, and EMGs were all within normal limits. Pl.'s Mem. 24, 25. However, Ms. Waller asserts that the ALJ failed to properly

consider the subjective evidence in the record in light of Ms. Waller's diagnosis of fibromyalgia. Pl.'s Mem. 25-26.

The ALJ summarized both the objective and subjective findings of Ms. Waller's treating sources. R. 25-26. The ALJ noted that the treatment Ms. Waller received was considered conservative. R. 25, 26. The ALJ further noted that Dr. LeNoach opined on August 22, 2008, fourteen days prior to her alleged onset date, that Ms. Waller could resume her work. R. 25.

Additional notations made in Ms. Waller's treatment records lend support to the ALJ's finding that Ms. Waller's allegations and subjective complaints were not fully credible. Nurse Practitioner Mertz found Ms. Waller "seem[ed] to have significantly more pain than her clinical presentation would suggest." R. 277. Dr. Gharbo stated Ms. Waller's "disability appear[ed] out of proportion to her impairment." R. 274. Dr. Soueidan observed that Ms. Waller's "symptoms are somewhat vague, without any specific functional limitation other than fatigability and the chronic pain, which in her opinion makes her disabled." R. 301.

Further, Ms. Waller's treating physicians encouraged her to exercise. Dr. Gharbo encouraged her to look into aquatic aerobics. R. 274. Dr. Soueidan and Dr. Lee encouraged her to keep up an exercise routine. R. 337, 340-41. On April 20, 2010, Dr. Soueidan noted Ms. Waller was exercising for 45 minutes, five days per week. R. 355. These recommendations are not consistent with Ms. Waller's allegations that her disabling pain would keep her from performing her past sedentary work. Defendant points out Ms. Waller testified that she earned a bachelor's degree in criminal justice in June 2009, nine months after her alleged onset date. Def.'s Mem. 29; R. 45. Accordingly, a review of the record reveals substantial evidence to support the ALJ's finding that Ms. Waller's allegations and subjective complaints were not fully credible.

## V.  RECOMMENDATION

Based on the foregoing analysis, it is the recommendation of this Court that Ms. Waller's Motion for Summary Judgment (ECF No. 12) be DENIED. The Court further recommends that Defendant's Motion for Summary Judgment (ECF No. 14) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

## VI.  REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. §  636(b)(1)(c):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(d) of said rules.  A party may respond to another party's objection within fourteen (14) days after being served with a copy thereof.

2. A district judge shall make a *de novo* determination of those portions of this Report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr*

*v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir.), *cert. denied*, 467 U.S. 1208 (1984).

_____/s/_____
Tommy E. Miller
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
July   10, 2013

## CLERK'S MAILING CERTIFICATE

A copy of the foregoing Report and Recommendation was mailed this date to each of the following:

Barbara Jean Evans-Yosief
Evans-Yosief Law Firm
1517 Hardy Cash Dr.
Hampton, VA 23666

Mark Anthony Exley
United States Attorney's Office
101 W. Main St., Suite 8000
Norfolk, VA 23510

By _____
Fernando Galindo, Clerk
Deputy Clerk

7-12 , 2013